UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRANDON T. BUSH,

    Plaintiff,

and

SELECTIVE INS. CO. OF AMERICA

    Inv. Plaintiff,                             Case No. 07-C-183

v.

TOWNSEND VISION, INC.,

    Defendant.

**DECISION AND ORDER**

On October 5, 2005, Plaintiff Brandon T. Bush suffered amputations to his left index, middle and ring fingers while operating a sausage making machine at the Salm Partners, LLC, ring sausage production plant in Denmark, Wisconsin. Bush sued Townsend Vision, Inc. ("Townsend"), the manufacturer of the machine, in state court under theories of both strict liability and negligence. Townsend, a New Jersey corporation with its principal place of business in Ohio, removed the case to federal court, asserting federal jurisdiction under 28 U.S.C. § 1332, and has now moved for partial summary judgment dismissing Bush's strict liability claim. Townsend contends that the strict liability claim fails as a matter of law because it is undisputed that the machine it sold Salm Partners was substantially changed prior to the accident. For the reasons that follow, Townsend's motion will be granted.

**BACKGROUND**

Salm Partners purchased a Townsend QX co-extrusion sausage processing system for its sausage production plant in Denmark, Wisconsin. The QX System is comprised of various machines linked by conveyor that perform various operations required for the production of ring sausage. It was manufactured and installed by Townsend.

Bush was injured when he reached into one of the machines to remove sausages that had become stuck. The problem of sausages becoming stuck in the machine occurred only with turkey sausages and was apparently due to a defect in machine's airflow system that affected the moisture content of the sausage. Prior to Townsend's discovery and repair of the defect, Salm Partners employees dealt with the problem by removing a barrier guard and manually loosening the stuck sausages so they could continue through the production line. (Christopher P. Salm Dep. 26: 4-20, 28:14-16 October 3, 2007.) The guard was fastened to the machine by four bolts. In order to remove the guard, a wrench or pliers was needed to loosen and remove the bolts. (Christopher P. Salm Dep. 73: 20-21.) The accident occurred when Bush reached into the unguarded machine to remove sausage segments and the spinning blades caught the tips of his glove and pulled his hand into the machine. (Compl. ¶ 5.)

**ANALYSIS**

Under Wisconsin law, which governs this diversity action, a plaintiff must prove five elements to prevail on a strict liability claim:

> (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause . . . of the plaintiff's injuries or damages, (4) that the seller

2

engaged in the business of selling such product, or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.

*Dippel v. Sciano*, 37 Wis.2d 443, 460, 155 N.W.2d 55 (1967). In this case it is the fifth element that is at issue. Townsend contends that the undisputed evidence establishes that its machine was substantially changed after it left its control. Specifically, Townsend argues that the fact that the guard was removed from the machine precludes holding it strictly liable for Bush's injuries.

In support of its argument, Townsend relies primarily upon *Glassey v. Continental Insurance Co.*, 500 N.W.2d 295 (Wis.1993). In *Glassey*, the plaintiff was injured when a cap blew off a pressurized spray tank and struck him in the head. *Id.* at 298. The cap in question was a nonstandard cap that had been replaced since its manufacture. *Id.* at 299. The court noted that there were substantial differences between the original and the replacement cap. *Id.* Because of these differences, and because the cap was essentially the cause of the accident itself, the court concluded that the tank's manufacturer could not be held strictly liable:

> We conclude that in order to maintain a strict products liability claim the plaintiff must show that the product has not undergone a substantial and material change from the time it left the manufacturer or seller. When the condition of a product at the time of an accident is substantially and materially different from its condition at the time it left the control of the manufacturer or seller, the plaintiff will be unable to prove its prima facie case and the strict products liability claim must be dismissed.

*Id.* at 301 (citations omitted). The Court went on to explain what it meant by a substantial change and material change in the product:

> A substantial and material change is a change in the design, function or character of the product linked to the accident. In this case there was a substantial and material change in the design and character of the spray tank linked to the accident because the DeVilbiss filler cap was replaced with a non-standard cap. This change was

3

material to the accident because it was the replacement cap that blew off the spray
tank striking Glassey in the head.

*Id.*

Townsend argues that the same reasoning applies here. The allegedly defective machine was designed and sold with a guard bolted over the area where Bush inserted his hand. The removal of the guard changed the design, function or character of the machine by making it more dangerous. Had the guard not been removed, the injury could not have occurred. Thus, the change was material to the accident. Just as in *Glassey*, Townsend argues that the change prevents Bush's effort to hold the manufacturer strictly liable for his injuries.

In response, Bush first argues that the evidence is disputed as to who removed the guard prior to the accident. Bush cites testimony from Chris Salm, one of the principals of Salm Partners, that he does not know who removed the guard on the day of the accident. Noting the Townsend employees were present "during this time frame," Bush argues that it is even possible that one of Townsend's own employees removed the guard. (Pl.'s Br. Against Mot. for Summ. J. ¶ 2.) But summary judgment is not the time to argue possibilities. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Here, Townsend has presented undisputed evidence that Salm Partner employees were removing the guard in order to remove sausages that became stuck in the machine. Bush ignores this evidence and offers nothing but speculation to suggest otherwise. This is not sufficient to create a genuine dispute of material fact. Moreover, even if Bush was able to produce such evidence, it would not change the result. It is undisputed that the machine was sold with a

4

guard. It is the condition of the product at the time of sale that determines whether strict liability applies. *Dippel*, 37 Wis. 2d at 460. If Bush could show that a Townsend employee removed the guard while attempting to repair the defect and left it off after it was placed in operation, it would be evidence that Townsend, through its employees, was negligent, not that its machine was defective and unreasonably dangerous at the time it left Townsend's control. It follows that the question of who removed the guard is not material to the issue now before the court.

Bush next argues that *Glassey* is not controlling here because the facts are distinguishable. Unlike *Glassey* where the original cap was replaced with a different kind, Bush argues that in this case the guard was simply removed and no part of the Townsend machine was replaced or modified. (Pl.'s Br. Against Mot. for Summ. J. ¶ 4.) Removing a guard from a machine, Bush suggests, is significantly different than replacing one part with another. In support of his argument, Bush cites *Rios v. Rockwell Intern. Corp.*, 701 N.Y.S.2d 386 (N.Y. App. Div. 1st Dept. 2000), where the court held that the removal of a safety guard on a printing press did not constitute a material alteration that would cut off strict liability for a defective product. But in *Rios*, the Court noted that "the safety guard was designed to be removed from the press with relative ease to facilitate periodic press maintenance." *Id.* at 387. The Court concluded that the trial court had correctly ruled that "the removal of a safety guard designed to be readily removed did not constitute a material alteration." *Id.* Although *Rios* is silent as to what steps were needed to remove the guard, here the evidence shows that removal required the use of a wrench to remove the four bolts that fastened the guard to the machine. Other cases suggest that the *Rios* analysis is not applicable here.

A year before *Rios*, for example, the same New York appellate court ruled on another safety guard removal related injury in *Barnes v. Pine Tree Mach.*, 691 N.Y.S.2d 398 (N.Y. App. Div. 1st

5

Dept. 1999). In *Barnes*, the Plaintiff injured his hand after it was drawn into a wire stripping machine he was operating. *Id.* at 399. Prior to the injury, safety guards that had been installed by the defendant manufacturer before the machine was shipped had been removed. *Id*. The court affirmed the trial court's holding that the defendant manufacturer "could not be held liable on a strict products liability theory where, after the machine left its possession, there was a subsequent modification that destroyed the functional utility of a key safety feature the use of which would have prevented plaintiff's harm." *Id*. With regard to the ease in which the guard could be removed, the court stated: "[a]lthough the operator's safety guard could be moved on a hinge for cleaning and maintenance purposes and was not permanently affixed, there was no showing that its removal increased the machine's functionality or that the machine was 'purposefully designed' so that it could be used without the safety guard in place." *Id*.

In *Burrows v. Fastener Engineers, Inc.*, 604 N.E.2d 838, 839 (Ohio App. 2 Dist.,1992), another finger amputation case with substantially similar facts to this case, an Ohio appellate court affirmed a trial court's ruling which granted the defendant machine manufacturer's motion for summary judgment with respect to strict liability. The court upheld the trial court's conclusion that the removal of the guard by the employer was a "substantial alteration," thereby relieving it of liability for the worker's injuries. The employee in *Burrows* was injured "when his gloved hand was caught and pulled into the unguarded feed rolls of a combination coil shear/pre-feeder/uncoiler machine." *Id.* The plaintiff employee asserted in his complaint that the machine's manufacturer:

> failed to provide adequate warnings . . . and failed to test the machine under all foreseeable conditions . . . , that the removeability of the machine's safety guard and its failure to be interlocked and interfaced into machine operation by means of a limit switch . . . constituted a design defect, and that his injuries were a direct and proximate result of [the manufacturer's] negligence.

6

*Id.* In analyzing whether removal of the guard was a substantial alteration, the *Burrows* court reasoned that "the very fact that the machine . . . was manufactured with a guard gives rise to the presumption that the manufacturer intended that it remain there for the protection of the operator, thereby rendering the machine safe for its intended use." *Id.* at 841. Moreover, the plaintiff never presented evidence that the machine was intended to be operated without the guards in place, that the guard was inadequate, or that the machine "contained an inherent design defect." *Id.* The court explicitly rejected the plaintiff's assertion that "because the removal of guards was . . . necessary in the daily operation of the machines . . ., its removal and the failure to replace [them] . . . constituted a design defect." *Id*. at 840.

As in *Barnes* and *Burrows*, there is no evidence in this case suggesting that the guard's removal increased the machine's functionality or that the machine was "purposefully designed" to operate without the guard in place. According to Christopher Salm, the sticking problem was "intermittent" and only occurred when Salm was making turkey sausage. Salm had produced beef-based sausage before the accident without incident. (Christopher P. Salm Dep. 28: 25, 29: 1-7, 43: 15-19.) Furthermore, the guard on the Townsend machine was not hinged (as in *Barnes*) or secured by easily removable fasteners such as wing nuts. On the contrary, the evidence shows that the guard was attached by four bolts that were designed to be removed using a wrench or a pliers. (Christopher P. Salm Dep. 73: 20-21.) The fact that the guard could be removed for cleaning or maintenance did not render the machine defective or unreasonably dangerous. Were it otherwise, most machines would be considered so.

Finally, Bush argues that the removal of the guard does not constitute a substantial change because Townsend "anticipated and knew that the gate would need to be removed and was being

7

removed for cleaning." (Pl.'s Br. Against Mot. for Summ. J. ¶ 4.) In other words, Bush argues that removal was not so much an alteration of the machine as it was a foreseeable use of the product. Bush's reliance on this argument is misplaced because the Wisconsin Supreme Court has expressly rejected foreseeability as an element considered in strict products liability claims. *Glassey*, 500 N.W.2d at 303. In *Glassey*, the Court rejected the foreseeability rule "because it does not promote the policies that underlie the imposition of strict products liability on a manufacturer or seller." *Id.* at 302. Instead, the Court ruled that forseeability is an element of negligence by stating that "[w]hen a substantial change that is material to an accident has occurred to a product after the product has left the control of the manufacturer, we believe public policy and equity is best served by common law negligence rules." *Id*. The Court has since reiterated these principals in *Haase v. Badger Mining Corp.*, 2004 WI 97, ¶ 41, 274 Wis.2d 143, 682 N.W.2d 389, stating "Glassey underscored that 'foreseeability is not an element considered in strict liability claims' . . . . We cannot fathom that this holding could be clearer.' We take this opportunity to reiterate them once again." 2004 WI 97 at ¶ 41 (citation omitted).

In sum, the removal of the guard from the Townsend QX system constitutes a substantial and material change in the Townsend machine which precludes application of strict liability principles. Townsend's motion for partial summary judgment is therefore granted, and Bush's product liability claim is dismissed. The Clerk is directed to set this matter on the Court's calendar for trial and pretrial on the remaining claim.

**SO ORDERED** this ___16th___ day of July, 2008.

     s/ William C. Griesbach  
     William C. Griesbach  
     United States District Judge